United States District Court
Southern District of Texas

**ENTERED**

January 27, 2023

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Amelina E. Martinez, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action H-22-288 |
| | § | |
| Kilolo Kijakazi, | § | |
| Acting Commissioner of the | § | |
| Social Security Administration, | § | |
| *Defendant.* | § | |

## MEMORANDUM AND RECOMMENDATION

Amelina E. Martinez appeals the Social Security Administration (SSA) Commissioner's final decision denying her application for social security benefits. ECF No. 1. Pending before the court are Plaintiff's Motion for Summary Judgment, ECF No. 10, and Defendant's Motion for Summary Judgment, ECF No. 12. These motions are before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1). Having considered the motions, administrative record, and applicable law, the court recommends that the final decision of the Commissioner be affirmed.

## 1. Background and Procedural Posture

Martinez applied for disability insurance benefits (DIB), supplemental security income (SSI), and disabled widow's benefits[1] (DWB) on May 4 and 5, 2020. Tr. 104–06. Martinez claimed that she became disabled on February 12, 2019, due to incarcerated umbilical hernia, depression, and reconstructed ankle. Tr. 68, 80, 90.

Martinez was born on November 3, 1967, and was fifty-one years old on the alleged disability onset date and fifty-two years old on the start of the DWB prescribed period. Tr. 68, 79, 90. Martinez passed the General Educational Development (GED) test in 1988. Tr. 331. Prior to filing for disability benefits, Martinez worked as a salesclerk at a hotel gift shop, a customer service representative at a storage rental facility, and a retail store manager. *Id.*

The SSA denied Martinez's applications on July 13, 2020. Tr. 104–06. Martinez sought reconsideration on August 14, 2020. Tr. 171–72. The application was again denied on October 22, 2020. Tr. 152–54. Martinez requested a hearing, and Administrative Law Judge (ALJ) Vincent Bennet held a hearing on May 5, 2021, in Houston, Texas. Tr. 29–67, 180–81.

At the hearing, the ALJ heard testimony from Martinez, a physical medical expert, a psychological medical expert, and a vocational expert (VE). Tr. 30–65.

---

[1] Martinez is the unmarried widow of a deceased, insured worker and was previously found to meet the non-disability requirements for DWB. Tr. 13. The remaining requirement, establishing that she was disabled, was before the ALJ. *See* Tr. 11, 13.

Martinez was represented by an attorney. Tr. 29. At the hearing, the ALJ agreed to keep the record open for two weeks to receive additional medical records. *Id.* The additional medical records have been made part of the administrative record. Tr. 13 (citing the additional evidence).

The physical medical expert, John Anigbogu, M.D., testified that the records submitted up to the time of the hearing showed that Martinez had a history of hypertension without evidence of end-organ damage and that she had diabetes and was morbidly obese. Tr. 34–35. Dr. Anigbogu testified that Martinez had a ventral hernia that was repaired but became infected and that she had an "abdominal wound healed by secondary intention." *Id.* Dr. Anigbogu could not determine from the record whether the hernia repair took longer than twelve months to heal because the latest medical notation stated that there was an open abdominal wound. *Id.* He suggested that the ALJ ask Martinez to clarify the issue. *See id.*

Martinez stated, "I came home with the wound . . . [and] had it . . . about a good seven or eight months and I had a fall that reopened it and then it took an additional -- about a month or two after that." Tr. 36. The ALJ observed that a July 3, 2020 "record indicates . . . that the January hernia incision was well healed" and asked Martinez if that "sound[ed] about right." *Id.* (quoting Tr. 1003). Martinez responded, "Something like that, yes sir, yes sir." *Id.* With that clarification, Dr. Anigbogu agreed that the hernia surgery had been resolved as of July 3, 2020. *Id.*

3

Dr. Anigbogu testified that Martinez's diabetes was severe. Tr. 37. Martinez interjected that she was not diabetic and that the record reflected she was pre-diabetic for two months before diet changes resolved the issue. *Id*. Dr. Anigbogu testified that, in order to accommodate limitations from the hernia repair and obesity, Martinez should be limited to light work with no pushing and pulling or use of ladders, ropes, or scaffolds. Tr. 38. Dr. Anigbogu explained that, after hernia surgery, pushing or pulling would increase the intraabdominal pressure. *Id*. The ALJ asked if that would be addressed by limiting her to light work, and Dr. Anigbogu responded, "She should be able to do light work[] but no pushing or pulling." *Id*. The exchange continued:

> [ALJ]: Well, that's my point, sir, if she can do light work, would she not be able to push or pull, within the limits of light [work]?
>
> [Dr. Anigbogu]: Yes.
>
> [ALJ]: Okay, so pushing or pulling would not be a separate limitation then, correct?
>
> [Dr. Anigbogu]: Yes.

Tr. 38–39. Dr. Anigbogu went on to explain that, during the time Martinez was healing from the surgery, Martinez would have been incapable of light work, but once it healed, "I don't see anything that precludes [light work]." Tr. 39.

Martinez's attorney cross-examined Dr. Anigbogu about whether the hernia surgeries and repairs would limit Martinez's ability to bend at the waist. Tr. 39.

4

Dr. Anigbogu agreed that bending could possibly exacerbate her hernia problems but did not testify that additional limitations were necessary. Tr. 39-40. Dr. Anigbogu also testified Martinez's obesity, not her hernia condition, was the limiting factor in terms of her ability to climb ramps and stairs; that is, her ability to climb ramps and stairs would be unchanged by the surgery. Tr. 40-41.

The psychological medical expert, Ashok Khushalani, M.D., testified that the medical record indicated diagnoses of severe depression, post-traumatic stress disorder, and anxiety disorder. Tr. 42. He opined that Martinez's mental impairments of anxiety and depression did not meet or equal listed impairments in 20 C.F.R. Part 404, Subpt. P, App'x 1 (Listing). Tr. 42. Dr. Khushalani doubted Martinez's diagnosis of post-traumatic stress disorder because the only place it appeared in the record was in the consultative examiner's (CE) report. Tr. 42–43. Dr. Khushalani testified that Martinez met the paragraph A Listing criteria for anxiety; that her anxiety would have mild or moderate effects on the four assessment areas of the paragraph B criteria; and that there was no evidence of paragraph C criteria. Tr. 43. Dr. Khushalani testified that Martinez would be limited to simple and detailed tasks; that she could have only occasional public contact; and that she could not have fast-paced production requirements. Tr. 43–44.

Martinez's attorney cross-examined Dr. Khushalani about whether the CE indicated Martinez needed more mental limitations. Tr. 44. Dr. Khushalani

responded that the CE examination tests were not always reliable and that other indications were all self-reported. Tr. 44–45. Dr. Khushalani opined that the erroneous diagnosis of post-traumatic stress disorder called the CE's overall credibility into question. Tr. 45. Dr. Khushalani further testified that Martinez was not any more limited in interacting with others because her anxiety was based on fear of the unknown rather than social interaction. *Id.*

The ALJ asked the VE to classify the jobs that Martinez listed on her work history report. Tr. 46. The VE testified that Martinez's prior work history would be classified by the Dictionary of Occupational Titles (DOT) as storage facility rental clerk, salesclerk, and retail manager. *Id.* The VE noted that retail manager is usually performed at the light exertional level, but that Martinez performed the work at a medium exertional level. *Id.*

Martinez testified that her most recent relevant work involved a significant amount of walking and the use of stairs. Tr. 48–49. Martinez testified that, while she had a walker at the time, she only used the walker at home and not at work. Tr. 49.

Martinez testified that in 2007, when she weighed 150 pounds, she had her first hernia surgery. Tr. 49. She testified that she continued to work and take care of her children. Tr. 49–50. Martinez testified that after she was laid off from her job, she developed a recurrence of her hernia. Tr. 49. According to Martinez, due to an old ankle injury she had trouble with balance and had a history of falls. Tr. 50, 57.

She said that falling made "the hernia reoccur and pop out and twist and [that,] whenever it twisted, it cut off [her] oxygen[.]" Tr. 50. Martinez testified that when she sought emergency medical treatment for her hernia, the medical providers would attempt to push the hernia back in place, which would often result in the hernia emerging from another location. Tr. 50. She testified that she visited the emergency room every five to six months for treatment of her hernia. *Id.* Martinez testified that, rather than undergoing another operation, the doctors continued to push the hernia back in place and gave her pain medication. Tr. 50–51. She testified that this occurred until doctors discovered the hernia was infected and admitted her to the hospital for four days. Tr. 51. She had a second hernia surgery at that time. Tr. 52.

Martinez testified that she was discharged home after the second surgery with a walker and shower bench. Tr. 51. She explained that she used a walker consistently and lived in government housing that was handicap equipped. Tr. 52. She testified that, after that surgery, she would become exhausted while standing in the shower. *Id.* She explained that her abdomen would become hard and cause pressure on her back and hips. *Id.* She could obtain relief from these symptoms only by lying flat on her back. *Id.* According to Martinez, she spent most of her day reclining and could not sit upright for long periods. Tr. 56.

Martinez believed her physical limitations were made worse by the second surgery. Tr. 53. She testified that she had a large lump on her stomach that affected

her kidneys and her menstrual cycle. *Id.* She further testified that she needed to fast sixteen hours per day to avoid developing a hard, internal mass until it passed. *Id.* Martinez testified that she was told by a doctor that she should not work, lift, or bend after the surgery. *Id.* Martinez testified that she could feel the mass when she attempted to bend over and, as a result, could no longer pick up things from the floor. *Id.* She testified that she could carry no more than four pounds and no longer carried a purse. *Id.*

Martinez testified that, at the time of the hearing, her weight was about 255 pounds and she stood four feet, ten inches tall. Tr. 54–55. She claimed to be fasting and dieting but that weight loss was slow. Tr. 54. Martinez testified that she could stand for no more than two minutes at a time and had to sit down to perform household activities. Tr. 55. She could not mop or vacuum, had to sit down to put on clothes, and would avoid anything that required "pulling or picking up." *Id.* Martinez testified that she had not driven in two years, that she no longer had a valid driver's license, and that she did not intend to renew her license in the future. *Id.*

About her mental health, Martinez testified that she had trouble with concentration and social interaction. Tr. 55–56. Because of her poor concentration, people had to repeat questions to her. Tr. 56. Martinez's children had to read paperwork for her because she could not understand it. *Id.* She was prescribed Zoloft to help her sleep and for her depression. *Id.*

The ALJ asked the VE what work a hypothetical individual of the same age, education, and vocational history as Martinez could perform if limited to light work with the following additional limitations:

> This individual is going to be limited to ground level work only. No work involving ladders, ropes or scaffolds. They're going to have some additional limitations. They're going to be [able to] understand, remember and carry out detailed, but not complex, instructions, make decisions, interact adequately with supervisors and coworkers, respond appropriately to changes in a routine work setting. They cannot have fast paced, quota driven production or assembly line work. Their work must be goal oriented, without pace, but completed by the end of the shift. They are limited to just occasional public contact.

Tr. 58.

The VE testified that such an individual would not be able to perform any of Martinez's past work. Tr. 58. The VE testified that, because of the nature of Martinez's prior work and the limitation to occasional public contact, Martinez had no transferable skills. Tr. 58–60. The VE testified that an individual with the RFC provided above would be able to perform the jobs of price marker, routing clerk, and laundry folder—all light, unskilled positions. Tr. 60. The ALJ asked a number of other hypotheticals that are irrelevant to his ultimate decision. Tr. 62–63. On cross-examination, the VE confirmed his earlier testimony that Martinez had no transferable job skills. Tr. 64. The VE also confirmed that his testimony was consistent with the DOT and his experience and was not inconsistent with sources of information acceptable to the Commissioner. Tr. 65. Before closing the hearing,

the ALJ offered Martinez the opportunity to make any further comments, but she declined to do so. *Id.*

The ALJ issued his decision on May 27, 2021, finding that Martinez was not disabled from February 12, 2019, the alleged onset date, through the date of the decision. Tr. 10–21. Martinez filed a request for review of the ALJ's decision on July 31, 2021. Tr. 285–86. On November 22, 2021, the Appeals Council denied Martinez's request for review. Tr. 1–4. Martinez timely filed a complaint and application to proceed in forma pauperis in federal court on January 26, 2022. *See Martinez v. Kijakazi*, H-22-mc-177, ECF No. 1 (S.D. Tex. Jan. 26, 2022).

**2. Legal Standards**

The Social Security Act provides disability insurance benefits to individuals with physical and mental disabilities who have contributed to the program and provides supplemental security income to individuals with physical and mental disabilities who have limited income and resources. *See* 42 U.S.C. §§ 423, 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner uses a sequential, five-step approach to determine whether the claimant is disabled. *See Schofield v. Saul*, 950 F.3d 315, 317 (5th Cir. 2020);

*see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020). The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step. *See Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021). A finding that the claimant is disabled or not disabled at any point in the five-step review terminates the analysis. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

The court's review of the ALJ's disability determination is highly deferential, and the court asks "only whether substantial evidence supports the decision and whether the correct legal standards were employed." *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018) (citations omitted). "A decision is supported by substantial evidence if 'credible evidentiary choices or medical findings support the decision.'" *Salmond v. Berryhill,* 892 F.3d 812, 817 (5th Cir. 2018) (quoting *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance.'" *Id.* (quoting *Williams v. Admin. Rev. Bd.*, 376 F.3d 471, 476 (5th Cir. 2004)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The reviewing court must scrutinize the record to determine whether substantial evidence supports the ALJ's decision. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). The court may not reweigh the evidence, substitute its judgment, or resolve conflicts in the evidence. *Id.*

### 3. Analysis of the ALJ's Determination

#### A. Step One

At step one, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (2020). A person engaged in substantial gainful activity is not disabled, regardless of her medical condition, age, education, or work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b) (2020).

The ALJ found that Martinez had not engaged in substantial gainful activity since the alleged onset date of February 12, 2019. Tr. 13. This finding is not in dispute.

#### B. Step Two

At step two, the ALJ determines whether any of the claimant's impairments or any combination thereof is severe and has lasted or is expected to last a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii) (2020) (citing 20 C.F.R. § 404.1509); 20 C.F.R. § 416.920(a)(4)(ii) (2020) (citing 20 C.F.R. § 416.909). A claimant is not disabled if she "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement[.]" 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii) (2020). Thus, the ALJ must decide whether the claimant has a severe impairment that has lasted or is expected to last at least twelve months. *See id.*

An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c) (2020). An impairment is *not* severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Salmond*, 892 F.3d at 817 (emphasis omitted) *(*quoting *Loza v. Apfel,* 219 F.3d 378, 391 (5th Cir. 2000)) (stating word for word the standard articulated in *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985)); *see also* SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985) (stating that an impairment is not severe "when medical evidence establishes only a slight abnormality . . . which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered").

The ALJ correctly articulated the step-two standard as:

> To be a severe impairment the medical evidence must establish more than a slight abnormality or combination of slight abnormalities that would have more than a minimal effect on an individual's ability to work. The impairment must significantly limit a person['s] physical or mental ability to do basic work activities (SSR 85-28) for a continuous period of at least twelve months.

Tr. 13 (citing SSR 85-28, 1985 WL 56856). The Fifth Circuit has confirmed that the SSR 85-28 articulation comports with the *Stone* standard. *See Keel*, 986 F.3d at 556.

13

The ALJ found that Martinez had the following severe impairments: obesity and anxiety disorder. Tr. 13. The ALJ found Martinez's hypertension was non-severe because it caused "no more than minimally vocationally relevant limitations." *Id.* The ALJ found that Martinez's "hernia surgery and resulting infection resolved prior to twelve months." Tr. 14. The ALJ also considered the medical evidence that Martinez submitted after the hearing, noting in his decision that Martinez "had other visits for hernia[s] but nothing lasting twelve months." *Id.* (citing Tr. 483–983, 1080–1201). The ALJ concluded that the hernia impairment did not "meet the threshold [duration] criteria for a severe impairment." *Id.*

Martinez argues that the ALJ conflated the severity and durational requirements. ECF No. 11 at 9. Citing *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986), Martinez argues that an impairment may qualify as "severe" at step two, even though it does not affect the person's ability to work for the full twelve months, provided that the impairment exists for the full twelve months. *See* ECF No. 11 at 9–10. The ALJ in *Singletary* found that a mental condition that was not severe for more than short periods of time did not satisfy the duration requirement. *Singletary*, 818 F.2d at 821. The Fifth Circuit characterized the ALJ's finding as "confus[ing] the duration requirement, which applies only to the impairment, with the severity requirement, which determines whether the impairment prevents the claimant from working." *Id.* The court explained that "[t]he statute quite clearly

requires that it is the impairment only which must last for a continuous period," and that "[t]he ability of a claimant to engage in work for limited periods of time certainly calls into question the severity of the impairment, but it does not necessarily determine whether the impairment, however severe, has lasted for at least 12 months." *Id.*

In *Frank v. Barnhart*, 326 F.3d 618, 621 (5th Cir. 2003), the Fifth Circuit clarified the circumstances under which *Singletary* applies:

> In *Singletary*, the applicant suffered from a severe mental impairment. Although he could sometimes work for short periods of time, he could never hold a job for long periods. We held that working in short spurts only did not constitute "substantial gainful activity" and that the applicant therefore might qualify as "disabled."
>
> Here, nothing in the record suggests that Frank can work only in short spurts. Even Frank herself does not contend that her situation resembles Singletary's: she does not allege that she can work for short spans of time, but cannot hold a job. Instead, she just seems to contend that she cannot work at all. We therefore do not see how the ALJ committed any error under Singletary.

*Id.* As was the case in *Frank*, Martinez does not contend that she is able to work on a sporadic basis. Instead, she contends that she cannot work at all. Thus, *Singletary* does not control.

The Fifth Circuit has more recently acknowledged that an impairment does not meet the duration requirement if it has improved after treatment such that the claimant's ability to work is no longer affected by the impairment. *See Glenn v. Barnhart*, 124 F. App'x 828, 829 (5th Cir. 2005). In *Glenn*, the Fifth Circuit found

that an ALJ's decision that the plaintiff had not satisfied step two comported with the proper legal standard and was supported by substantial evidence where the objective medical evidence:

> demonstrated that [the plaintiff's] ability to perform basic work activities . . . [was] affected by his back impairment for a period of less that twelve months. The medical evidence shows that although Glenn had a back impairment, he responded to the treatment and suffered few if any limitations that affected his ability to work within a year of his surgery. Medical impairments that reasonably can be remedied or controlled by medication or treatment are not disabling. *Id.* (collecting cases).

As with the ALJ's decision in *Glenn*, the ALJ's decision in this case is supported by substantial evidence. Martinez attended two medical appointments in July 2019—approximately five months after the alleged date of her disability onset—at which she reported no abdominal pain and did not mention recurring problems with hernias. *See* Tr. 423–24, 428–29 (listing a 2007 hernia repair in the medical/surgical history section). On October 4, 2019, Martinez presented to the emergency department complaining that her "hernia popped out." Tr. 619. Martinez explained to the emergency department nurse that "sometimes this happens and [she] is able to push it back in." *Id.* She could not do so on that occasion because it was too painful. Tr. 624. She underwent a computed tomography scan that showed the presence of "umbilical ventral abdominal wall hernia [that] contains several loops of small bowel and mesentery" but no evidence of obstruction. Tr. 622, *see also*

16

Tr. 840. The hernia was "reduced at bedside[,]" and Martinez was hospitalized overnight. Tr. 627–28.

On January 22, 2020, Martinez presented to the emergency department complaining of abdominal pain and "projectile vomiting." Tr. 517. The treatment note stated that Martinez had a past medical history "significant for recurrent umbilical hernia" Tr. 616. A bedside reduction was unsuccessful, and Martinez was admitted to the hospital. Tr. 615–16. Martinez underwent an "[e]xploratory laparotomy with extensive lysis of adhesions and a small bowel resection" on January 31, 2020. Tr. 616. She remained hospitalized due to infection risk and was discharged on February 12, 2020. Tr. 615.

At a follow-up appointment in March 2020, Martinez reported that her wound was healing well and reducing in size. Tr. 497. In April 2020, she reported that the pain was controlled and that she was not experiencing any wound problems. Tr. 494. A treatment note dated June 30, 2020, states that the incision from the January hernia surgery had "not completely healed and a small portion of the wound [would] open[] when she walk[ed] up stairs or put[] pressure on the wound." Tr. 1002. A treatment note dated July 3, 2020, states, "Mid line abdominal incision has healed except for one ¼ cm spot mid way, it will come together, then split open again over and over especially when she has to walk rather clumsily slowly down steps at her home."

Tr. 1003. This was the most recent treatment note in the record at the time of the hearing in May 2021.

As discussed above, at the hearing Dr. Anigbogu stated that he was unable to determine from the medical record when the hernia surgery wound healed and stated that testimony from Martinez would be helpful. Tr. 35. Martinez testified that the wound had been healing for about seven or eight months after the surgery when she fell and reopened it, which required healing for an additional month or two. *Id.* The ALJ read aloud from the July 3, 2020 treatment note and asked Martinez if the hernia wound had healed by that date. *Id.* Martinez agreed that it had. *Id.* Based on Martinez's testimony and the July 3, 2020 treatment note, Dr. Anigbogu agreed "that the hernia surgery had been resolved as of that date[.]" *Id.* Substantial evidence supports that ALJ's conclusion that Martinez had healed from the hernia surgery as of early July 2020—less than twelve months from the onset of the hernia in October 2019. Tr. 14, 36.

Substantial evidence also supports the ALJ's conclusion that "[s]he had other visits for hernia's [sic] but nothing lasting twelve months. (Ex. 2F; 8F; 9F) Therefore, it does not meet the threshold criteria for a severe impairment." Tr. 14. On September 16, 2020, Martinez presented at the emergency department after falling and injuring her left arm, rib, and back. Tr. 1010. She denied having any abdominal pain. *Id.* An abdominal examination performed that day showed "normal

bowel sounds," "no distension," "abdomen is soft," "no abdominal tenderness," and "no guarding or rebound." Tr. 1012; *see also* Tr. 1022. Martinez departed the emergency room "without signs of pain or distress." Tr. 1021.

On October 15, 2020, Martinez presented at the emergency department with abdominal pain. Tr. 1083. She complained of swelling and distension of the right side of her abdomen. *Id.* She was not in "acute distress" at the time. Tr. 1085. Notes from the emergency room physician state that he found a "small sliding-type hiatal hernia." Tr. 1087. Other notes indicated that there was "no evidence of obstruction or incarceration." Tr. 1090. Martinez stated that she was experiencing right-sided abdominal pain, which was similar to the left-sided abdominal pain that she had experienced with prior incarcerated hernias. Tr. 1094. Diagnostic studies showed "[e]vidence of superior ventral abdominal wall repair with large umbilical/perumbilical ventral abdominal hernia (below repair changes)." Tr. 1145. The treatment providers did not recommend surgical intervention but recommended aggressive weight loss to optimize hernia management. Tr. 1101. She was discharged home in "stable" condition. Tr. 1090. The evidence contains no indication that this new right-sided hernia was a continuation of the left-sided hernia that was repaired in January 2020.

On November 30, 2020, Martinez sought treatment for "recurrent hernia." Tr. 1186. She reported her hernias to be "an ongoing struggle" and she wanted

"something more definitive performed." Tr. 1189. She reported abdominal pain. *Id.* The assessment and plan after that visit stated that "[w]ithout significant weight loss patient is at risk for continued recurrent hernias post operation." Tr. 1194. The physician recommended bariatric surgery evaluation. *Id.* There are no indications in the record that Martinez would need to limit her activity due to the hernias.

On December 11, 2020, Martinez sought treatment for "weight loss options." Tr. 1176. At the time, she stated that her ventral hernia caused her "discomfort." Tr. 1179. She reported abdominal pain. Tr. 1182. The physician discussed the benefits of bariatric surgery with Martinez but noted that Martinez was unable to have the surgery due to lack of insurance. Tr. 1185. There is no discussion in the record of limitations or distress due to Martinez's hernias.

On January 12, 2021, Martinez attended another appointment "for evaluation of recurrent hernias." Tr. 1164. She stated that she had a "bulge" in her abdomen since her January 2020 surgery, which "bother[ed] her daily." *Id.* A progress note that day describes her abdominal examination findings to include "large central midline bulge that is reducible and lower midline incisional hernia that is incarcerated, both nontender to palpation." Tr. 1167. After examination, radiology, and other testing, the treatment provider explained to Martinez that "hernia repair prior to weight loss would put her at risk for continued recurrent hernias." Tr. 1168;

*see also* Tr. 1174. Again, nothing in the record indicates that Martinez was in acute distress, or that she would have to limit her activities due to the hernias.

In summary, Martinez had a hernia beginning in October 2019 that was surgically repaired in January 2020 and was fully healed as of July 2020. She reported no further hernia symptoms in the three months thereafter. Thus, the hernia condition manifesting in October 2019 did not meet the twelve-month duration requirement. She had one other emergency room visit in October 2020 for a different hernia and was shortly thereafter discharged. She continued seeking treatment to achieve a final solution to her obesity and hernia problems, but there is no evidence that the hernias interfered with her ability to work. Thus, the ALJ did not err in determining that Martinez's hernia impairment did not meet the duration requirement. *Cf.* 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1) (2020) (stating that the claimant bears the burden of proving that she is disabled); *Keel*, 986 F.3d at 555 (stating that the claimant bears the burden of proof on the first four steps).

In any event, the ALJ acknowledged that he must consider all impairments, severe or not severe, in his RFC analysis. Tr. 12. As is discussed below, the ALJ considered Martinez's hernia issues in determining her RFC. Moreover, Martinez has not demonstrated she is more limited than the RFC the ALJ ultimately found, and she is thus not prejudiced by any error the ALJ may have made at step two. *See Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (quoting *Audler v.*

*Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)) ("Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected."); *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001) ("The Court requires . . . a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision.").

**C. Step Three**

At step three, the ALJ determines if any of the claimant's severe impairments meets or equals a listed impairment in appendix 1 (Listing). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) (2020); *see also* 20 C.F.R. Part 404, Subpt. P, App'x 1 (2020). If all the criteria of a Listing section are met or equaled, the claimant is considered disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d) (2020); *Whitehead*, 820 F.3d at 780–81.

The ALJ found that Martinez's impairments or combination of impairments did not meet or medically equal the severity of an impairment defined in the Listing. Tr. 14. The ALJ appropriately considered Martinez's obesity in accordance with Listing section 1.00(Q) as well as Listing sections 12.04 (depression) and 12.06 (anxiety). Tr. 14–15.

Martinez does not dispute these findings.

### D. Residual Functional Capacity

Before reaching the final two steps, the ALJ must assess the claimant's residual functional capacity (RFC) "based on all the relevant medical and other evidence in [the] case record[.]" 20 C.F.R. §§ 404.1520(e) (2020) (citing 20 C.F.R. § 404.1545); 416.920(e) (2020) (citing 20 C.F.R. § 416.945); *see Perez*, 415 F.3d at 461–62 (citing 20 C.F.R. § 404.1545(a)(1)); SSR 96-8p, 1996 WL 374184, at *2, 3, 5 (July 2, 1996); *see also* 20 C.F.R. § 416.945(a)(1) (2020). An RFC assessment is a determination of the most a claimant can do despite all physical and mental limitations. *Perez*, 415 F.3d at 461–62 (citing 20 C.F.R. § 404.1545(a)(1)); SSR 96-8p, 1996 WL 374184, at *2, 4; *see also* 20 C.F.R. § 416.945(a)(1) (2020).

"The ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c) (2020); *see also Taylor v. Astrue,* 706 F.3d 600, 602–03 (5th Cir. 2012) (stating that the RFC determination is the "sole responsibility of the ALJ"). The ALJ also bears the responsibility of resolving conflicts in medical opinions. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7.

The ALJ determined that Martinez was limited to light work and could not climb ladders, ropes, or scaffolds; could understand, remember, and carry out detailed but not complex instructions; could make decisions; could interact adequately with supervisors and coworkers; could respond appropriately to changes in a routine work setting; could have occasional public contact; could perform goal-oriented work without pace requirements other than completion by end of shift; but should not have fast-paced, quota-driven production or assembly line work. Tr. 16.

In determining Martinez's physical RFC, the ALJ considered and discussed Martinez's subjective complaints, her 2020 function report, the medical evidence, the state agency reviewing consultants' opinions, Dr. Anigbogu's hearing testimony, and Dr. Kushalani's hearing testimony. Tr. 16–19. The ALJ found Martinez more physically and mentally limited than the state agency reviewing consultants in both the initial and reconsideration decisions. *See* Tr. 18–19. The ALJ found the hearing testimony and opinions of Drs. Anigbogu and Khushalani persuasive in formulating the RFC. *See* Tr. 19.

Martinez disagrees with the ALJ's RFC finding. *See* ECF No. 11 at 7. As the court understands her position, Martinez contends that the ALJ did not fully integrate into the RFC Dr. Anigbogu's opinions about pushing and pulling and bending at the waist. As discussed above, Dr. Anigbogu responded to the ALJ's question regarding

Martinez's limitations with "Light work. There shouldn't be any pushing and pulling." Tr. 38. The ALJ sought clarification and Dr. Anigbogu stated, "the reason why I added that [no pushing or pulling] is basically because of the hernia surgery, you really want to watch anything that is going to increase the intraabdominal pressure." *Id.* The ALJ followed up with "would that have been resolved by putting Ms. Martinez at light?" *Id.* When Dr. Anigbogu again stated that she could not push or pull, the ALJ was more direct with "Well, that's my point, sir, if she can do light work, would she not be able to push or pull, within the limits of light as defined by the Commissioner?" Tr. 39-40. Dr. Anigbogu answered "yes," and the ALJ clarified, "so pushing or pulling would not be a separate limitation then, correct?" Dr. Anigbogu answered "yes." Tr. 39.

> Under the regulations,

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category . . . when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567, 416.967. The ALJ found that Martinez's "ability to push and pull within the light level should not aggravate the hernias." Tr. 18. That conclusion is consistent with Dr. Anigbogu's testimony and is thus supported by substantial evidence. Dr. Anigbogu also did not recommend any limitations on bending, and the

ALJ included none outside of limiting Martinez to light work. Martinez does not cite evidence to support her argument that she is more limited than the RFC as found by the ALJ.

The ALJ fully complied with his duty in determining the RFC. He provided "a narrative discussion describing how the evidence supports [his] conclusion, citing specific medical facts[,]" which support the limitation to light work. *See* SSR 96-8p, 1996 WL 374184, at *7. Because the ALJ complied with SSR 96-8p, he did not err in his assessment, which is supported by substantial evidence.

### E. Step Four

At step four, the ALJ determines whether the claimant can perform jobs she previously worked by comparing the RFC determination with the demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2020); *see also Perez*, 415 F.3d at 462. If the claimant can perform her past work, she is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2020). If the claimant cannot perform her past work, the ALJ proceeds to step five. *See* 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1) (2020).

The ALJ stated that Martinez's past relevant work exceeded her residual functional capacity because Martinez was limited to occasional public contact. Tr. 19. This finding is not disputed.

**F. Step Five**

At step five, the ALJ determines whether the claimant can perform any other work by considering the claimant's RFC and other factors, including age, education, and past work experience. *Schofield*, 950 F.3d at 318 (quoting 20 C.F.R. § 404.1520(a)(4)(v)); *see also* 20 C.F.R. § 416.920(a)(4)(v) (2020). If the claimant can perform other work available in the national economy, the claimant is not disabled. *Schofield*, 950 F.3d at 318 (citing 20 C.F.R. § 404.1520(g)); *see also* 20 C.F.R. § 416.920(g)(1) (2020).

The ALJ found that Martinez could perform jobs that exist in significant numbers in the national economy. Tr. 20–21. The ALJ relied on the hearing testimony of the VE that an individual of Martinez's age, education, and RFC would be able to work as a price marker, routing clerk, and laundry folder. *Id.* Because the VE's testimony was based on a hypothetical question that incorporated all the limitations reasonably recognized by the ALJ and Martinez's attorney cross-examined the VE, the VE's testimony is substantial evidence supporting the ALJ's step-five determination. *See Masterson*, 309 F.3d at 273–74 (holding that the ALJ properly relied on the VE's testimony because the ALJ "scrupulously incorporated" all the limitations "supported by the evidence and recognized by the ALJ" and gave an opportunity for cross-examination).

## 4. Conclusion

The ALJ's decision denying social security benefits is consistent with the law and supported by substantial evidence. There is no genuine issue of material fact, and summary judgment is appropriate. Fed. R. Civ. P. 56(a), (c). Accordingly, the court recommends that Defendant's motion for summary judgment be granted and Plaintiff's motion for summary judgment be denied.

The parties have fourteen days from service of this Memorandum and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas on January 27 , 2023.

Peter Bray
United States Magistrate Judge